JOHN W. GRAB, Plaintiff-Appellant, v. HOWARD J. KELLER, JR., Indiv. and as Co-Trustee, *et al.*, Defendants-Appellees.

First District (4th Division)   No. 1—90—1649

Opinion filed December 19, 1991.

David J. Feeley, Ltd., of Winnetka, and David A. Novoselsky & Associates, of Chicago (David A. Novoselsky, of counsel), for appellant.

Ashcraft & Ashcraft, Ltd., of Chicago (Timothy J. McGonegle, of counsel), for appellees.

JUSTICE LINN delivered the opinion of the court:

Following the entry of summary judgment in their favor, defendants filed a petition for attorney fees against plaintiff, John W. Grab. Defendants are Howard J. Keller, Jr., individually and as co-trustee, and the Northern Trust Company as co-trustee under the will of Howard J. Keller. According to the fee petition, brought pursuant to section 2—611 of the Illinois Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—611), plaintiff's lawsuit was frivolous and unfounded. One judge granted summary judgment to defendants on the merits of the lawsuit and another judge heard and granted the petition for attorney fees.

On appeal, plaintiff argues that the trial court abused its discretion in finding a violation of section 2—611 and also in awarding an amount of fees without adequate proof.

We reverse.

BACKGROUND

In December 1980, Grab purchased a cooperative apartment from the estate of Howard J. Keller. A month earlier, plaintiff had executed the sales agreement, which made certain provisions for prorations at closing. Approximately three years later, plaintiff informed the Northern Trust Company, through new counsel, that he had not received proper credits for real estate taxes and the co-op's portion of the outstanding mortgages at the time of closing. The Northern Trust responded with a letter explaining the bank's position that the explicit wording of the real estate sales agreement precluded any cause of action based on the further proration of real estate taxes or mortgages, which were paid as part of the monthly assessment amount. Plaintiff's counsel also contacted the attorney who had handled the sale and closing on behalf of plaintiff in 1980. That attorney stated his

belief, in a letter, that plaintiff was not entitled to any further credits or prorations based on the documents. Notwithstanding this information, plaintiff filed suit to collect approximately $30,000 that he alleged was not credited to him at the closing.

In summary, plaintiff alleged that he had entered into an agreement to buy the co-op for $210,000 and that the price he paid for his apartment unit should have been credited with its *pro rata* share of the outstanding mortgages on the apartment building. This proration was calculated at $22,241. In addition, plaintiff alleged that he should have received a proration credit of $6,283.92 for the 1980 real estate taxes. Instead, the only proration he received at closing was for that portion of the monthly assessment of $1,097.43 that he was entitled to as of the date of closing, December 12, 1980. The monthly assessment included interest on the mortgage and a charge for a tax escrow and operating expense escrow.

Defendants filed an answer and affirmative defenses, along with a motion for judgment on the pleadings. Defendants' position was that plaintiff received all the prorations he was entitled to under the express terms of the agreement and that his action was thereby precluded. Judge Thomas Rakowski heard arguments on the motion and ultimately concluded that the real estate sales agreement of November 20, 1980, was ambiguous, as to both the issue of the outstanding mortgage balance and the unpaid real estate taxes.

Thereafter, Judge Willard J. Lassers heard defendants' motion for summary judgment and concluded that the evidence in favor of defendants' position was "overwhelming." Accordingly, the court granted judgment in favor of defendants.

Defendants filed their motion for attorney fees, which was heard by Judge Myron Gomberg. The judge reviewed the papers and granted the motion, noting that the action "shouldn't ever have been filed at all." Judge Gomberg subsequently denied plaintiff's motion to reconsider the granting of sanctions and set a date for hearing on the amount of fees. The matter was transferred to the assignment judge, however, and still another judge was assigned to the case. That judge declined to assess damages based on another judge's finding of a section 2—611 violation and the matter came back before Judge Lassers, the judge who had granted summary judgment in favor of defendants as to the merits of the complaint.

Over plaintiff's objection, Judge Lassers ruled that the fee petition itself could stand as the direct presentation of the movant, and that plaintiff could then cross-examine the affiants, who were the ac-

counting manager for the defendants' law firm and a partner of the firm. Another lawyer was examined also.

The trial court filed a memorandum and order, granting fees and costs in the amount of $4,964.68. This figure was based on the time and costs expended after November 25, 1986, the effective date of the revised section 2—611 (Ill. Rev. Stat. 1987, ch. 110, par. 2—611). This section required courts to assess fees if the signer of pleadings was found to have failed to undertake a reasonable inquiry as to whether a pleading was well-grounded in fact or warranted by existing law. Section 2—611 has since been preempted by Supreme Court Rule 137 (134 Ill. 2d R. 137), which restores discretion to the trial court in deciding whether to award sanctions. Judge Lassers did not explain why the earlier version of section 2—611 was inapplicable and did not award fees and costs for the period before November 1986. In his order, the judge noted that the issues were not highly specialized and the work for which fees were sought "involved a motion for summary judgment based upon extrinsic evidence for a contract found to be ambiguous."

OPINION

We believe that the resolution of this appeal depends on whether plaintiff's interpretation of the real estate sales agreement is merely tenuous, as distinguished from "frivolous," in the sense of being unreasonable and untrue. (See, *e.g., Ready v. Ready* (1961), 33 Ill. App. 2d 145, 161, 178 N.E.2d 650, 658 (legislature intended to penalize "frivolous or false matters").) Based upon our review of the record, we find that the requirements of section 2—611 have not been met in this case.

■ Initially, there was a question in the trial court as to which version of the attorney fee statute should apply. We find that because the second amended complaint was filed in 1984, the applicable law is the original version of section 2—611 (the successor to section 41 of the Civil Practice Act), which provided that sanctions could not be awarded unless the allegations were "made without reasonable cause and found to be untrue." (Ill. Rev. Stat. 1983, ch. 110, par. 2—611.) This version of section 2—611 is recognized as narrower in scope than the amended (and now superseded) version. We have noted that the 1986 version of section 2—611 "is much more extensive in scope than the prior version in that it now extends to every paper filed by a party, is applicable to attorneys as well as litigants, and does not expressly limit 'appropriate sanctions' to 'reasonable expenses actually incurred by the other party' and attorney fees as did its predecessor."

*Safeway Insurance Co. v. Graham* (1989), 188 Ill. App. 3d 608, 613, 544 N.E.2d 1117, 1120 (new section 2—611 could not be applied retroactively).

The contract in question is structured as a sale of shares of stock in the building corporation, along with the transfer of a proprietary lease on the apartment unit. The purchase price is given as $210,000, with $21,000 to be paid as earnest money and "the balance of $189,000, *plus or minus prorations*, at the time of closing." The emphasized language forms the basis for plaintiff's lawsuit.

The contract contains only one other reference to prorations, in paragraph 8, which reads as follows:

> "8. Seller represents that the present monthly assessment, including interest on the mortgage, taxes and operating expenses, is $1,097.43. Seller shall pay all assessments to date of closing. *The assessment for the month in which closing occurs shall be prorated between the parties.*" (Emphasis added.)

Another provision of the agreement, paragraph 4, refers to the existence of a first and second mortgage which secured the building corporation's promissory notes. This paragraph states that the "Buyer agrees to accept the Assignment of the Proprietary Lease subject to the terms of those mortgages."

The closing statement dated December 12, 1980, is a form that contains the address of the property, the buyer's and seller's names, the broker's name and address and the credits given to purchaser and seller. It also contains blank lines or spaces next to printed language referring to taxes and mortgages. The form shows only these credits to the purchaser, typed in the appropriate spaces: a $21,000 credit representing earnest money, and a $189,682.62 payment, representing the balance of the purchase price. Under the seller's column is the contract price of $210,000 plus the proration of the assessment for the month of closing, $672.62. The prorated period was from December 12 to December 31, and the seller received the credit because it had paid the full monthly assessment of $1,097.43 for December. This handling of the proration appears to be consistent with paragraph 8 of the sales agreement, which specifically refers to the inclusion in the assessment of mortgage interest and taxes.

Plaintiff maintained in the trial court that he was entitled to receive a credit for the outstanding mortgage balance attributable to his apartment unit, as well as the 1980 real estate taxes. In his second amended complaint, he argued that the agreement for the sale of shares in the building corporation was ambiguous as to what, exactly, was to be prorated at the time of closing. To aid the court in inter-

preting the allegedly ambiguous agreement, plaintiff attached to his second amended complaint as an exhibit the listing agreement for the cooperative apartment he had purchased. This document showed a listing price of $255,000, "broken down as a mortgage balance and equity, both of which totaled $255,000." The second amended complaint claims damages in excess of $35,000.

In July 1985, Judge Rakowski heard the defendants' motion for judgment on the pleadings of the second amended complaint. In opposition to the motion, plaintiff took the position that paragraph 8 of the contract was limited to the monthly assessment proration, which included current mortgage interest. According to plaintiff, paragraph 8 did not address the question of a proration credit for the principal balance of the mortgage attributable to the apartment unit. In other words, the sum of approximately $22,000, which would be that portion of the total principal mortgages on the building allocated to the unit in question, should have been "paid off" at closing, or credited to the buyer. Instead, the buyer paid the full amount of the "gross" purchase price. Because he was not credited for paying off the seller's mortgage indebtedness and tax liability, he overpaid and should be reimbursed.

Defendants countered by citing paragraph 4, which states that the buyer accepts the proprietary lease. The lease necessarily subjugates the unit buyer's interest to the terms of the existing mortgages on the whole building.

From the record it is apparent that the arguments of counsel caused confusion, and the judge put the hearing over to the following day, when additional arguments were presented. Plaintiff raised the issue of custom and usage, specifically in the context of how real estate taxes are paid in Illinois. For example, taxes for the year 1979 are not paid until 1980. Accordingly, plaintiff contended that he should have been credited in 1980 and 1981 with a portion of the real estate taxes for 1979 and 1980, since his monthly assessments in 1980 and 1981 would be paying off the 1979 and 1980 liability.

Defendants reiterated their position that the unambiguous contract terms were controlling.

The judge considered that, while paragraph 8 of the agreement dealt with the monthly assessment as including a portion of mortgage interest and real estate taxes, the contract did not "seem to control" two matters, the "unpaid" real estate taxes and the outstanding mortgage. The judge declined to assume that either side had agreed to be responsible for the unpaid taxes and mortgage principal, finding that it appeared to be a missing term in the contract. Reviewing para-

graph 4, the section dealing with the buyer's taking the property subject to the proprietary lease and mortgage terms, the judge said that he could not interpret paragraph 4 to "read anything more than what it says." The judge noted, "Again, I have the same problem with respect to ambiguity. It doesn't appear that the parties have reached an agreement as to what is to be done with the outstanding mortgage." Responding to the defendants' assertion that the proprietary lease itself created obligations, the court noted that such an argument "takes [defendants] completely out of the ambit for motion of judgment on the pleadings because that [lease] agreement isn't incorporated by reference into this agreement."

The judge concluded that the motion for judgment on the pleadings would be denied, finding "the contract in question is ambiguous as to both issues, issue of the outstanding mortgage balance and the issue as to the unpaid real estate taxes."

█ In light of the parties' arguments and Judge Rakowski's findings, we cannot conclude that attorney fees should have been assessed upon a later court's determination that plaintiff's lawsuit was unfounded as a matter of law or based on false statements of fact. In our opinion, attorney fees should not be awarded simply because two judges out of three may have found plaintiff's theory untenable in light of the express terms of the agreement for the sale of the co-op apartment.

Once Judge Rakowski found an ambiguity based on what he viewed as a missing term, he concluded that extrinsic evidence was needed to resolve the factual question of which party was responsible for the prorated items.

The question of the parties' intent was subsequently resolved in favor of defendants, on summary judgment. Plaintiff's deposition testimony set forth reasons why he believed he was entitled to the additional credits. Referring to the gross price in the listing agreement, plaintiff explained that it is customary to advertise co-op apartments at gross prices, less a credit for the mortgage. Although the price he paid, $210,000 was less than the reduced asking price of $240,000, he believed that the $210,000 was a "gross" price against which the mortgage balance attributable to his unit would be credited.

To contradict plaintiff's stated belief, defendants offered the affidavit of the attorney who had represented plaintiff during the sales negotiations and closing. Plaintiff's current attorney objected to the use of such affidavit, which stated that plaintiff appeared to understand and approve the deal and that he voiced no challenge to the closing statement figures. Judge Lassers expressed doubts about the

propriety of relying on the statements of plaintiff's former attorney and therefore did not consider the affidavit in deciding the motion for summary judgment.

Defendants also argued that plaintiff, who was a "sophisticated buyer" with a seat on the Chicago Board of Options Exchange, freely signed the agreement to purchase the co-op after negotiating down the purchase price. By signing the agreement, he knew his interest was subject to the existing proprietary lease and mortgages on the building. The transfer of ownership of shares of stock in a co-operative building corporation requires such an arrangement, and plaintiff had the advice of counsel and his accountant.

During argument on the motion for summary judgment, the parties again explained their respective positions as to the ambiguity or lack of ambiguity in the contract. Plaintiff's counsel explained his gross price theory, which views the payment of $210,000 as an overpayment because it included what in effect is a debt of the seller. To bolster his position regarding his understanding of the agreement, plaintiff presented the standard real estate form contract that he had completed and signed as his offer to purchase the co-op. Boilerplate language in that form provided that existing mortgages and lien indebtedness would be paid out of the sales proceeds. Plaintiff also referred to the affidavit of a representative of the bank trustee, which said that after receiving the plaintiff's form offer, the bank conveyed its "acceptance." That form contract was never signed by the bank as trustee, however, and the agreement that was ultimately executed was drafted to conform to the mechanics of a transfer of shares in a co-operative building corporation.

Judge Lassers rejected plaintiff's position because it was "in the teeth" of the parties' agreement. In the judge's view, the case was "clear cut." The parties had entered into a negotiated sales agreement that covered all relevant terms and at the closing plaintiff failed to state any surprise over or objection to the exclusion of what would be a substantial credit of almost $40,000. It was not until three years later that he raised the issue of his supposed overpayment. The judge found that the parties' agreement "unmistakably and unequivocally provides for only one item to be prorated; namely, the assessment for the month in which the closing occurred and that was to be prorated." The judge concluded that the evidence was overwhelmingly in favor of granting defendants' motion for summary judgment.

Defendants then filed their motion for attorney fees pursuant to section 2—611. Judge Gomberg heard the arguments and granted the motion, stating that he did not want to consider the extraneous docu-

ments that had been considered in the two previous hearings. In his view, the final, signed version of the parties' contract was all that was relevant. The judge said that plaintiff was bound by the contract he signed and that it was "clear, that is not ambiguous at all."

It is well established that fees are not automatically awarded when a party's legal theories and conclusions are found unavailing; if that were the law, fees would go to the prevailing party in many a case. (See *Chicago Title & Trust Co. v. Anderson* (1988), 177 Ill. App. 3d 615, 532 N.E.2d 595 (section 2—611 does not permit trial courts to impose sanctions simply because an argument or theory of recovery is unjustified; sanctions are not awarded for failure to prevail) (affirming fee award under circumstances).) Here, there is no evidence that plaintiff advanced wholly unwarranted theories of law or made false statements of fact.

In *Lecrone v. Leckrone* (1991), 220 Ill. App. 3d 372 (one judge dissenting), this court reversed a trial judge's award of sanctions in a case involving the attempt of plaintiffs to impress a constructive trust on a decedent's estate and the estate executors for dissipation of estate funds supposedly earmarked for plaintiffs. The plaintiffs' attorneys had found one constructive trust case that arguably supported their legal theory, although that case involved an intestate estate as distinguished from a testamentary estate. The trial court believed that plaintiffs' theory of recovery was contrived and lacked meaningful investigation of the facts or existing law. On appeal, however, this court disagreed that plaintiffs' "tenuous" theory warranted the imposition of sanctions, and set aside the award. See also *Prevendar v. Thonn* (1988), 166 Ill. App. 3d 30, 518 N.E.2d 1374, *appeal denied* (1988), 121 Ill. 2d 586, 526 N.E.2d 839 (reversing award of attorney fees against unsuccessful plaintiffs despite trial court's finding that the case was not well-grounded in fact or law; fact that plaintiffs failed to establish a *prima facie* breach of contract in connection with a written management contract was not a basis for fee award); *Wollschlager v. Sundstrand Corp.* (1986), 143 Ill. App. 3d 347, 493 N.E.2d 107 (fees for meritless lawsuit properly denied where litigant had demonstrated an unwavering belief that the basis of his claim was valid).

In *La Salle National Bank v. Kissane* (1987), 163 Ill. App. 3d 534, 516 N.E.2d 790, the court affirmed denial of attorney fees against a bank that had alleged it held valid title in an action to quiet title. The court held that the bank's incorrect assertion was a *legal conclusion* and that even though the bank's title was found to be void, sanctions based on "untrue" pleadings were inappropriate under the circum-

stances. The court held that the bank's position that it held valid title "was not a factual statement but instead a legal conclusion. Therefore, La Salle was entitled to present this issue to the court for a ruling." 163 Ill. App. 3d at 542-43, 516 N.E.2d at 795.

Similarly, we believe, the essence of plaintiff's claim required legal construction of the agreement, based on the documents and other matters presented. He was entitled to advance the issue for a ruling and, in fact, one of the three judges who considered his arguments agreed that the executed agreement was ambiguous as written. That a later judge apparently based attorney fee sanctions on the fact that the contract was clearly *not* ambiguous misses the point of assessing attorney fees for untrue pleadings made without reasonable cause.

We agree with the trial court that plaintiff's legal conclusions were unpersuasive. Defendants did everything they could to explain to plaintiff's new attorney the strength of their position before the suit was filed and even put plaintiff on notice that they would seek attorney fees. It may therefore seem unfair that defendants are, by our decision, forced to pay the attorney fees caused by plaintiff's lawsuit. Ours remains a system of requiring both sides to bear their own fees, however, and the penalty embodied in section 2—611 is not to be employed for punishing losing parties who fail to adequately support their legal positions. Contracting parties may wish to draft attorney fee provisions in their agreements as a matter of course, and thus avoid submitting their claims for fee sanctions to judges that may hold differing viewpoints as to which suits are truly frivolous (and which are "merely meritless").

We believe that in situations involving contract construction courts should be cautious in awarding sanctions if the reason for the award is that one side "overwhelmingly" proves its position. Motions to dismiss or for judgment on the pleadings test the legal adequacy of pleadings. Motions for summary judgment test the adequacy of factual proof. These and similar motions are tools for ending litigation that is going nowhere. Plaintiff in this case survived a motion for judgment on the pleadings before one judge. He lost the subsequent motion for summary judgment before a different judge, but no specific factual statements were actually pinpointed as being false and made without reasonable cause. (See *Monahan v. Village of Hinsdale* (1991), 210 Ill. App. 3d 985, 996, 569 N.E.2d 1182, 1189 ("There is no evidence that the plaintiff's pleadings contained intentionally false allegations").) Instead, a third judge found liability for fees based on the belief that the contract was unambiguous in its meaning and that the case should not have been brought. Those differences in legal

judgment, however, should not result in attorney fee sanctions. See *Lewy v. Koeckritz International, Inc.* (1991), 211 Ill. App. 3d 330, 570 N.E.2d 361 (reversing fee sanction assessed against lawyers who argued to second judge an interpretation of an order that the original judge found contrary to his own intention).

For the foregoing reasons, we reverse.

Judgment reversed.

JIGANTI, P.J., and McMORROW, J., concur.